UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Alex D. McMillen,
     Plaintiff

     v.                                Case No. 12-cv-077-SM
                                               Opinion No. 2014 DNH 197
Concord Hospital,
     Defendant

**O R D E R**

Alex McMillen was employed by Concord Hospital as a security officer.  After the hospital fired him, he brought this action in state court, seeking damages for wrongful termination under New Hampshire's common law (count one), and unlawful retaliation under the federal Family and Medical Leave Act (count two).  Concord Hospital removed the case, invoking this court's federal question jurisdiction.  See 28 U.S.C. § 1331.  See also 28 U.S.C. §§ 1441(a) and 1446.  The parties have engaged in substantial discovery and Concord Hospital now moves for summary judgment on both counts.  McMillen objects.

For the reasons stated, Concord Hospital's motion for summary judgment is granted.

**Standard of Review**

When ruling on a motion for summary judgment, the court must construe the record in the light most favorable to the non-moving

party and resolve all reasonable inferences in that party's
favor.  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir.
2014).  Summary judgment is appropriate when the record reveals
"no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).
In this context, "a fact is 'material' if it potentially affects
the outcome of the suit and a dispute over it is 'genuine' if the
parties' positions on the issue are supported by conflicting
evidence."  Int'l Ass'n of Machinists & Aerospace Workers v.
Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996)
(citations omitted).  Nevertheless, if the non-moving party's
"evidence is merely colorable, or is not significantly
probative," no genuine dispute as to a material fact has been
proved, and "summary judgment may be granted."  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations
omitted).

    The key, then, to defeating a properly supported motion for
summary judgment is the non-movant's ability to support his or
her claims concerning disputed material facts with evidence that
conflicts with that proffered by the moving party.  See generally
Fed. R. Civ. P. 56(c).  It naturally follows that while a
reviewing court must take into account all properly documented
facts, it may ignore a party's bald assertions, speculation, and

unsupported conclusions.  See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).  See also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").


## Background

Concord Hospital hired McMillen as a "per diem" security officer in July of 2006.  About a year later, he was promoted to a full-time position, working the second shift.  During the course of his employment, McMillen reported to his shift supervisor, Carl Hamel, who, in turn, reported to the hospital's security manager, Michael Payeur.  All three men worked under the supervision of John Charron, the director of the hospital's security operations.


According to the hospital, beginning in early 2008, concerns began to surface that McMillen was not performing his job with the requisite degree of seriousness.  In April of that year, and again in August, he was given written warnings (from Mr. Payeur) concerning inappropriate and unprofessional behavior.  See Reports of Disciplinary Action (documents no. 15-3 and 15-4).

3

In March of the following year, McMillen was injured in a motorcycle accident.  In response, the hospital offered, and he accepted, leave under the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. (the "FMLA").  He was out of work for seven weeks.  During that time, several of McMillen's colleagues, including Hamel and Payeur, donated portions of their own leave time so McMillen could continue to receive pay after he had exhausted his earned time off.  When McMillen returned to work in May, the hospital accommodated him with a "light duty" position, at the same rate of pay he had been earning prior to his accident.  According to McMillen, the light duty position was "approved by both the Human Resources and Employee Health Departments and it was consistent with [his] physician's recommendations."  Complaint, at para. 10.  About two weeks later, McMillen's physician lifted his work restrictions and he returned to full duty as a security officer.  Id. at paras. 12-13.

In June of 2009, as part of McMillen's annual evaluation, his direct supervisor (Carl Hamel), prepared an assessment of McMillen's job performance and submitted it to the security department manager (Mike Payeur).  In it, Hamel made the following observations:

4

**Performance:**  When under pressure or in emergent situations, Office McMillen performs exceptionally well.  He is able to quickly assess the situation and do what is required for a positive outcome.  However, when Officer McMillen is just doing patrols or has free time, he does not seem to take his responsibilities seriously enough.

**Communications and Report Writing:**  Again, Officer McMillen has both good and bad communications issues.  Officer McMillen's radio transmission are generally clear and precise.  However, over the past year Officer McMillen's radio etiquette has become less and less professional.  On a few occasions Officer McMillen has made inappropriate comments over the radio.

* * *

**General Attitude:**  Combined with the fact that Officer McMillen likes to joke around and have a good time his attitude, of late, seems to be that he really does not care one way or the other.

Memorandum dated June 16, 2009 (document no. 15-6).  Other notable weaknesses in McMillen's job performance included a failure to patrol parking areas accurately and exercise good judgment when issuing tickets or speaking to individuals about parking issues, and a failure to complete his paperwork in a timely manner.  Id.

After reviewing that memo as well as other information available to him, Payeur prepared McMillen's annual "Performance Evaluation."  The details of that document need not be recounted. It is sufficient to note that Payeur made the following "Overall Assessment" of McMillen's performance:

5

> Officer McMillen has slipped backwards in his overall
> performance over the last year becoming less engaged
> with the requirements of the job.  Officer McMillen has
> reportedly used unprofessional radio etiquette and has
> seemingly taken on an attitude of "I don't care,"
> regarding his job performance.  I find Officer McMillen
> to be capable of very high performance and have
> witnessed him in very volatile and emergent situations
> where he performs exceptionally well.  However it
> appears that when routine duties like interior and
> exterior patrols or daily reports are needed his
> enthusiasm tends to dwindle.  I realize that it is
> always exciting to have code three response to attend
> to at all times but the reality is we are not in that
> business and perhaps Officer McMillen might be better
> suited for another career.  I understand that his
> ambition is to be in law enforcement but while here
> with us in security I will have to insist that he
> become more engaged and be a part of a functioning team
> as well as being attentive to all aspects of his job
> requirements and remaining professional while on duty.

Performance Evaluation (June, 2009) (document no. 15-5) at 3.

The overall theme of those documents is clear.  When McMillen was

interested and motivated, he was a capable (if not laudable)

employee.  But, he had grown disinterested and somewhat

complacent in performing the more commonplace and routine aspects

of his daily responsibilities.

Payeur met with McMillen to discuss the evaluation.

According to McMillen, Payeur told him the hospital was concerned

about his "I don't care attitude."  McMillen Deposition (document

no. 15-1) at 87.  McMillen explained that his seemingly

disinterested attitude was the product of feeling depressed in

6

the wake of his motorcycle accident and the perceived loss (due
to his injuries) of an opportunity to become a police officer one
day.

> I just had pretty much everything taken away from me in
> the blink of an eye.  Where I was at, I had a personal
> trainer.  I was fit and all set and worked pretty hard
> to where I was going to be, to be an officer then lost
> it all.  My plan was to get a law enforcement job
> before, and when I came back I pretty much told them,
> "I'm not going anywhere.  This is where I'm going to
> be," and we kind of discussed that.

Id. at 88.  McMillen returned to work and, while the hospital may
have been less than enthused about his job performance, it did
not take any adverse employment action.

In August, McMillen underwent arthroscopic surgery on his
knee to repair damage he had sustained in the motorcycle
accident.  He took the time away from work as "vacation" time,
rather than medical leave under the FMLA, because he "did not
want to face the same hurdles returning to work after this second
surgery as he did after his initial leave."  Complaint at para.
23.  Nevertheless, hospital policy still required McMillen to
obtain medical clearance before resuming his duties.  See Return
to Work Clearance by Employee Health Services (document no. 15-7)
at 1 (requiring medical clearance to return to work whenever "an
employee has any type of surgical procedure, hospitalization, or
emergency treatment, regardless of the amount of time missed from

work.  This includes any surgical procedure done while on 'vacation' or 'off time.'").

McMillen had planned to return to work on the Saturday of Labor Day weekend (September 5, 2009), but was informed by a co-worker that he could not do so without medical clearance. Complaint, at para. 25.  McMillen contacted his supervisor (Mr. Hamel), explained that he could not afford to take any unpaid days off from work, and asked if he could be permitted to work light duty over the weekend.  Hamel agreed and McMillen worked at the dispatch desk over the weekend.  Nevertheless, McMillen said that, during the following week, he heard rumors from co-workers suggesting that the hospital planned to fire him for having returned to work without the appropriate medical clearance.  <u>Id.</u> at para. 30.  That did not come to pass.  And, according to McMillen, he "worked without incident for the next couple months." <u>Id.</u> at 39.

On November 17, 2009, John Charron, the hospital's Security Director, issued a directive to members of the security staff. In it, he informed all security officers that they were not permitted to be seated while working in the hospital's "Yellow Pod" (the behavioral unit).  The purpose of that directive was simple and straight-forward: Charron did not want security

8

officers placing themselves in a vulnerable (seated) position
when working with or near potentially violent patients.  He was
also concerned that an agitated patient might use a nearby stool
or chair as a weapon.  <u>See</u> Affidavit of John Charron (document
no. 15-11), at para. 5.  <u>See also</u> Deposition of Michael Payeur
(document no. 15-2), at 114-16.  Three days later, as part of a
routine security audit, Charron was reviewing security footage
from the night before.  On it, he observed McMillen seated on a
stool in the Yellow Pod – in direct contravention of the
recently-issued security directive.  <u>See</u> Security Footage Still
Photographs (document no. 15-10) (showing McMillen seated on a
stool outside a patient's room).[1]

McMillen admits that he was seated while working in the
Yellow Pod – both inside the patient's room (while he says he was
trying to calm the patient), and outside the patient's room
(while a counselor spoke with the patient).  He also acknowledges
that the patient was "volatile," complaint at para. 57, and "very
aggressive," McMillen Affidavit (document no. 19-12) at para. 45.
Nevertheless, McMillen says he decided to sit outside the

---

[1]     Charron explained that he began "routine reviews of
surveillance" footage a few weeks earlier, after receiving
information "from various sources that the then second-shift
supervisor, Carl Hamel, and the Security Officers under his
supervision, were being lax with Department procedures."  Carron
Affidavit at para. 3.

patient's room because "he did not want the patient to feel that
he was being guarded, and he also wanted to remain close by in
case there was a violent incident."  Complaint at para. 57.  And,
despite the unambiguous language in Charron's recent directive
that no security officer should ever be seated in the Yellow Pod,
McMillen says he was actually conforming to provisions in the
hospital's employee handbook, which encourage staff members to
"show care and concern" for patients by sitting with them and
listening to what they have to say.  See Staff Member Handbook
(document no. 19-10) at 7.


Charron saw the matter differently, noting that, "Not only
was Mr. McMillen's use of a stool a blatant violation of my
directive, but it could have led (although thankfully did not) to
a very dangerous situation if Mr. McMillen was overtaken by a
violent patient or the stool was used by a dangerous patient as a
weapon."  Affidavit of David Charron at para. 5.  Based upon
McMillen's undeniable violation of the security directive,
Charron decided to terminate his employment.  Charron explained
his decision as follows:

> At the time I reviewed the footage on November 20,
> 2009, I knew that Mr. Mcmillen had received two prior
> written warnings for unprofessional conduct.  Both
> warnings involved Mr. McMillen "goofing around" on
> electronic devices that are intended to be used for
> professional purposes only.

> Given the nature of his prior warnings, my knowledge of
> Mr. McMillen's general "I don't care" attitude that
> permeated his work in the Department, and my
> observation of Mr. McMillen violating my directive, I
> made the determination that Mr. McMillen did not take
> his responsibilities seriously, and decided to fire him
> for sitting in violation of the directive.
>
> I consulted with Human Resources, but I was the sole
> decision-maker in determining to fire Mr. McMillen.

Id. at paras. 6-8.


According to McMillen, Charron's explanation is simply a
pretext for unlawful discrimination and wrongful termination.


## Discussion

I.   FMLA Retaliation.

To prevail on his FMLA retaliation claim, McMillen must
establish that: (1) he availed himself of a protected right under
the FMLA; (2) he suffered an adverse employment action; and (3)
there was a causal connection between that adverse action and his
protected conduct.  See Orta-Castro v. Merck, Sharp & Dohme
Quimica P.R., Inc., 447 F.3d 105, 113-14 (1st Cir. 2006).  In an
effort to satisfy that third element and demonstrate a causal
connection between having taken FMLA leave in May of 2009 and his
discharge six months later, McMillen points to the following:

1.   his deposition testimony that he believed his
     absence while on FMLA leave created a burden
     on Charron to fill the vacant spot;

2.    that, shortly after he told Payeur that he
      was depressed over his accident because he
      thought his injuries would prevent him from
      becoming a police officer, Payeur suggested
      that it might be time for him to "move on";

3.    that Concord Hospital "ignored its clearly
      established hierarchy" when he was fired by
      "his supervisor's supervisor's supervisor"
      (i.e., the director of the security
      department, Charron); and, finally,

4.    that Concord Hospital failed to follow
      "express procedures and protocols" when it
      terminated McMillen (presumably without
      giving him yet another warning about his
      unprofessional conduct or putting him on a
      performance improvement plan).

See Plaintiff's Memorandum (document no. 19-1) at 11-12.  See

also McMillen Deposition at 204-13 (speculating as to the link

between his FMLA leave and his discharge).  At best, that

evidence is immaterial, speculative, and/or exceedingly weak.  It

is insufficient to create a genuine dispute as to whether

McMillen was fired in retaliation for having availed himself of

FMLA leave.  See, e.g., Carrero-Ojeda v. Autoridad de Energia

Electrica, 755 F.3d 711, 721 (1st Cir. 2014) (affirming dismissal

of plaintiff's FMLA retaliation claim on grounds that the

complaint failed to set "forth sufficient facts to demonstrate a

causal connection between her FMLA leave-taking and defendants'

acts to establish a plausible claim for relief").  Here, as in

Carrero-Ojeda, the plaintiff has pointed to "no facts beyond the

timing of [his] discharge - e.g., no negative comments,

complaints, or expressions of reluctance by [his] superiors or co-workers about [his] FMLA leave-taking, no discussion of [his] FMLA leave status in performance reviews, etc. — that would lead us to think that defendants took [his] FMLA requests or leave status into account when deciding to discharge [him]." ).

It is well established that an employee's invocation of rights under the FMLA cannot be used as a negative factor in deciding to fire, suspend, or demote him.  It is, however, equally well established that such an employee <u>can</u> be discharged for independent reasons.  <u>See, e.g.</u>, <u>Henry v. United Bank</u>, 686 F.3d 50, 55 (1st Cir. 2012).  In this case, the record evidence overwhelming supports Concord Hospital's assertion that McMillen was fired because he had a history of failing to perform his job with the degree of seriousness the hospital expected and because, consistent with that history, he inexplicably disobeyed a direct order from the head of the security department regarding the performance of his duties.  Even crediting the evidence on which McMillen relies, a properly instructed rational jury could not conclude that his termination was in any way related to his earlier invocation of rights under the FMLA.

13

II.   <u>Wrongful Termination</u>.

    A.   <u>Supplemental Jurisdiction</u>.

Having disposed of plaintiff's only federal claim, the court must now determine whether it is appropriate to exercise supplemental jurisdiction over his remaining state common law claim.  <u>See</u> 28 U.S.C. § 1367.  McMillen suggests that if the court resolves his federal claim against him (as it has), it should refuse to exercise supplemental jurisdiction and remand his common law claim to state court.  The court declines that invitation.

The Court of Appeals for the First Circuit has identified the following factors that district courts should consider when determining whether to exercise supplemental jurisdiction over state law claims: (1) the interests of fairness; (2) judicial economy; (3) convenience; and (4) comity.  <u>See</u> <u>Camelio v. American Fed'n</u>, 137 F.3d 666, 672 (1st Cir. 1998).  Here, each of those factors counsels in favor of exercising jurisdiction over McMillen's common law wrongful termination claim.  This is particularly true since his claim raises no novel issues of state law but, rather, involves a fairly straight-forward claim invoking a well-developed body of New Hampshire common law.

Moreover, the parties themselves have indicated that they wish to resolve McMillen's claims in a cost-effective manner that avoids piecemeal litigation.  To that end, they filed a joint motion asking the court to hold in abeyance all pending deadlines and to defer scheduling a trial date until it had resolved the hospital's pending motion for summary judgment.  In that motion, the hospital noted (and McMillen agreed) that its pending motion seeks judgment on all of McMillen's claims, and the parties did not wish to expend additional resources preparing for a trial that might not be necessary.

In light of the foregoing, the court concludes that it is appropriate to exercise supplemental jurisdiction over McMillen's common law claim of wrongful discharge.

B.   The Merit's of McMillen's Claim.

McMillen worked for Concord Hospital as an "at-will" employee - that is, he did not have an employment contract. Consequently, as a general matter, either party was "free at any time to terminate the employment relationship, with or without cause."  Porter v. City of Manchester, 151 N.H. 30, 37 (2004) (citation and internal punctuation omitted).  An exception to that general rule is that "at-will" employees may pursue a cause of action in tort for wrongful discharge.  See Leeds v. BAE

15

Systems, 165 N.H. 376, 368-69 (2013).   Under New Hampshire common

law, to prevail on a claim for wrongful discharge, a plaintiff

must demonstrate two things:

> one, that the employer terminated the employment out of
> bad faith, malice, or retaliation; and two, that the
> employer terminated the employment because the employee
> performed acts which public policy would encourage or
> because he refused to perform acts which public policy
> would condemn.

Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992) (citing

Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 921-22

(1981)).   As this court has noted, the first element focuses on

the nature of the employer's actions, while the second element

focuses on those of the employee.   Antonis v. Elecs. for Imaging,

Inc., 2008 WL 5083979 *3, 2008 DNH 204 (D.N.H. Nov. 25, 2008).


As to the first essential element of McMillen's wrongful

termination claim, there is simply insufficient evidence in the

record to permit a rational and properly instructed jury to

conclude that Carron (or Concord Hospital) acted out of bad

faith, malice, or retaliation.

> Bad faith or malice on the part of an employer may be
> established under New Hampshire law where (i) an
> employee is discharged for pursuing policies condoned
> by the employer, (ii) the record does not support the
> stated reason for the discharge, or (iii) disparate
> treatment was administered to a similarly situated
> employee.

Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir.
2001) (citing Cloutier, 121 N.H. at 921-22).  Here, McMillen's
belief that his employment was terminated in bad faith or with
malice is entirely speculative; there is no evidence of disparate
treatment, nor is there evidence that McMillen was discharged for
pursuing policies condoned by Concord Hospital.  In fact, just
the opposite is true.  There is overwhelming evidence supportive
of Carron's assertion that he fired McMillen because he violated
the directive issued to all security officers that they were
never to be seated when in the so-called "Yellow Pod."

McMillen's wrongful termination claim also falls short on
the "public policy" element of his cause of action.  On that
point, McMillen asserts that Concord Hospital terminated his
employment because he might, some day, avail himself of
additional leave time under the FMLA and/or because he attempted
to calm an agitated patient (and, while doing so, assumed a
seated position).  Specifically, he alleges:

> Public policy discourages terminating employees because
> they may need future medical care.  In this case, the
> hospital anticipated that, due to his injuries from the
> accident, Mr. McMillen would need further treatment and
> would require leave.  He told numerous hospital
> personnel about the prospect of future surgeries.
>
> Public Policy (and indeed hospital policy) encourages
> employees to engage with agitated or distressed

> patients in constructive ways, which may mean sitting
> with the patients or otherwise making efforts to make
> the patients feel comfortable with the interaction.

Complaint at paras. 79-80.


McMillen's first claim - to have been in a situation in
which he might have invoked FMLA leave time at some point in the
future - can be dispatched quickly.  As noted above, the focus at
this stage of the court's analysis is on McMillen's conduct, not
the hospital's.  That is, McMillen must point to some conduct in
which he engaged that public policy encourages, or some conduct
in which he refused to engage that public policy condemns.  He
has not.  Instead, he relies on his "status" as an employee who
had previously taken FMLA leave and who "might" have invoked such
leave again in the future (but had not yet done so).  This court
has repeatedly rejected such status-based wrongful termination
claims.

> As the New Hampshire Supreme Court has made clear, the
> common law cause of action for wrongful discharge is
> not the proper means by which to remedy a discharge
> that was motivated by someone's status or physical
> condition.  Instead, that cause of action is properly
> invoked only when an employee is discharged in response
> to his or her having engaged in a "narrow category" of
> conduct.

Parker v. MVM, Inc., 2006 WL 1724359 *2-3, 2006 DNH 70 (D.N.H.

2006) (citing Howard v. Dorr Woolen Co., 120 N.H. 295, 297

(1980)).  See also Cooper v. Thomson Newspapers, Inc., 6 F. Supp.
2d 109, 115 (D.N.H. 1998) ("The New Hampshire Supreme Court has
rejected the notion that a termination based upon the employee's
status could form the basis for a wrongful termination claim
because such a termination is not based upon the employee's
action.").

McMillen's second claim - that public policy encourages
employees to engage agitated or distressed patients in
constructive ways, if necessary from a seated position - fares no
better.  There is no public policy that encourages employees to
be insubordinate and disregard direct orders from their
supervisors, particularly when those orders were issued to
protect the employee, co-workers, and hospital patients.  See
generally Short, 136 N.H. at 85 (noting that "an employee's
expression of disagreement with a management decision is not an
act protected by public policy"); cf. Bennett v. Thomson, 116
N.H. 453, 458 (1976) (holding that employee may be discharged
when opposition to an employer's policy may "seriously impair the
effectiveness of his performance, and substantially impede the
very tasks he was assigned to accomplish.").

McMillen's invocation of the hospital's "policy" that
encourages employees to sit with agitated patients in an effort

19

to calm them provides no support for his claim.  For one thing, the still pictures of the events in question plainly show McMillen seated <u>outside</u> the patient's room, out of the patient's view, while a staff member was inside the room speaking with the patient.  Given the circumstances presented (i.e., an agitated and potentially violent patient) and McMillen's role as a security officer in those circumstances (i.e., to be ready and able to lend assistance or summon help), there is no plausible public policy that McMillen can claim to have been pursuing or upholding when he chose to disregard a direct order of his supervisor related to the performance of his security duties and, contrary to his employer's direction, be seated in the Yellow Pod.[2]

## Conclusion

For the foregoing reasons, as well as those set forth in the hospital's memoranda, Concord Hospital has demonstrated that it is entitled to judgment as a matter of law on both claims advanced in McMillen's complaint.  Accordingly, its motion for summary judgment (document no. 13) is granted.  The Clerk of

---

[2]     "Although ordinarily the issue of whether a public policy exists is a question for the jury, at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law, and take the question away from the jury."  <u>Leeds v. BAE Systems</u>, 165 N.H. 376, 379 (2013) (quoting <u>Short v. School Admin. Unit 16</u>, 136 N.H. 76, 84 (1992)).

Court shall enter judgment in accordance with this order and close the case.

      **SO ORDERED.**

                              Steven J. McAuliffe
                              United States District Judge

September 22, 2014

cc:  Anthony S. Augeri, Esq.
     Marie M. McKean, Esq.
     Stacie B. Collier, Esq.